IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE APPLICATION OF SURESWIFT CAPITAL INC., SURESWIFT CAPITAL FUND A INC., SURESWIFT WORLDWIDE INC. AND SURESWIFT CAPITAL FUND B LLC FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. ___________ |

**MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

SureSwift Capital Inc. ("Capital"), SureSwift Capital Fund A Inc. ("Fund A"), SureSwift Worldwide Inc. ("Worldwide"), and SureSwift Capital Fund B LLC ("Fund B", and together with Capital, Worldwide, and Fund A, "Petitioner") respectfully submits this Memorandum of Law in support of its Application and Petition pursuant to 28 U.S.C. § 1782 ("Section 1782"), for an order authorizing Petitioner to obtain limited discovery from Chris Reedy ("Reedy" or "Respondent"), via the issuance of a subpoena *duces tecum* and a subpoena to appear at a deposition (the "Subpoenas") (the "Application").[1]

## PRELIMINARY STATEMENT

This Application arises in connection with an action pending in British Columbia, Canada (the "Canadian Litigation") brought by Petitioner against Defendant Kevin McArdle ("McArdle"). McArdle was the former Chief Executive Officer of both Capital

[1] The Subpoenas are attached as Exhibits A & B to the Declaration of Richard R. Voelbel ("Voelbel Decl.").

and Worldwide. In those roles, he provided services to Fund A and Fund B. In connection with his roles, McArdle owed fiduciary duties to Petitioner.

In the Canadian Litigation, Petitioner has alleged that McArdle breached his fiduciary duties by among other things, retaining consulting fees and referral fees from third parties for his personal benefit contrary to the terms of his employment, misappropriating company assets, misdirecting funds and misallocating expenses, failing to properly account for his salary, attempting to restructure Capital and Worldwide contrary to their best interest, and entering into transactions that were not in the best interests of Petitioner and instead were for his own personal benefit (collectively, "McArdle's Misconduct"). Due to the surreptitious nature of McArdle's Misconduct, the full extent of McArdle's violations is still unknown.

Respondent was the Vice President of Acquisitions of Capital and a member of Petitioner's leadership team from 2019 to 2022. In that role, he was privy to conversations with McArdle. Email correspondence during this period disclosed by Petitioner in the Canadian Litigation indicates that Respondent was aware of McArdle's Misconduct, assisted him with carrying out plans that were not in the best interests of Petitioner, and in some instances benefited from McArdle's Misconduct.

In particular, Respondent participated in discussions regarding consulting and referral fees that McArdle received from third parties for his personal benefit; took part in expensive educational programs that McArdle enrolled the entire leadership team in without the required board approvals; was involved in miscalculating management fees charged to Fund A and Fund B in order to inflate the value of Capital and Worldwide

without notifying investors; was blind-copied by McArdle on communications with McArdle's business partners that disclosed confidential negotiations and board-level discussions; actively contributed to the development of restructuring plans that were not in Petitioner's best interests; and prepared agreements for transactions that were likewise not in Petitioner's best interests and instead served McArdle's personal benefit, among other involvements.

Accordingly, Petitioner brings this Application to obtain information from Respondent for use in the Canadian Litigation.

This Application meets all of the requirements of Section 1782. Respondent "resides" and is "found" in this district because he lives in Minnesota. The discovery sought by Petitioner is highly material and relevant to the issues at stake in the Canadian Litigation. Moreover, each of the discretionary factors laid down by the Supreme Court in *Intel Corp. v Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), favors the discovery sought by Petitioner. Respondent is not a defendant in the foreign proceedings and is not subject to any subpoena power of the Supreme Court of British Columbia (the "BC Court"); the BC Court will be receptive to the aid sought here as it has previously held that there is no impediment to a party availing itself of the discovery procedures available under Section 1782 (see *Araya v. Nevsun Resources Ltd.*, 2019 BCSC 260 at ¶¶ 41 and 46 citing *Penty v. Law Society of British Columbia*, 1999 BCCA 630 at ¶¶ 26, 27, 32, and 41 attached as Exhibit B to the Declaration of Alexandra Luchenko ("Luchenko Decl.")); the application here does not seek to avoid any foreign prohibition on gathering evidence and is made in good faith; and the discovery requests are carefully circumscribed to avoid any undue

burden on Respondent. Accordingly, Petitioner respectfully requests that the Court grant the Application and permit Petitioner to serve the Subpoenas on Respondent.

## FACTUAL BACKGROUND

### A. The Parties

***Petitioner***. Capital and Fund A are British Columbia companies engaged in the business of locating, acquiring, operating, maintaining, and selling revenue generating businesses, primarily profitable and growing SaaS businesses. (Declaration of Don Wharton ("Wharton Decl.") at ¶ 5.) Worldwide is a wholly owned subsidiary of Capital (*Id.* ¶ 6.) Capital provides management services to Fund A and Fund B. (*Id.* ¶ 7.) Capital is also the Managing Member of Fund B. (*Id.*)

***Respondent.*** Reedy is an individual who resides in Falcon Heights, Minnesota. (*Id.* ¶ 13.) Reedy served as Vice President of Acquisitions at Capital from 2019 to 2022. (*Id.* ¶ 12.) In that capacity, he also provided services to Fund A and Fund B. (*Id.*) As set out in more detail below, during this time, Reedy had access to information concerning McArdle's Misconduct. Following their departure from Capital, Reedy joined McArdle in incorporating a new company, Big Band Software Holdco LLC ("Big Band"), a company that buys and grows SaaS businesses. (*Id.* ¶ 29.)

### B. Background

The premise of Capital's business model is to locate, acquire, maintain and sell revenue generating SaaS businesses (the "Acquired Businesses"). (*Id.* ¶ 8.) Any and all profits from the Acquired Businesses are to be used strictly to repay debt, make new acquisitions, or return profits to shareholders and investors (the "Model"). (*Id.* ¶ 9.)

McArdle expressly acknowledged that Capital was to be operated using the Model and agreed to strictly abide by it. (*Id.* ¶ 15.)

Following Capital's initial success, Fund A was created, and thereafter, again based on Fund A's success, Fund B was created. (*Id.* ¶ 10.) The business of all of the petitioners is each based on the Model. (*Id.* ¶ 11.)

**C. Employment Relationship**

As CEO for Capital and Worldwide, Petitioner has alleged that it was an express or implied term of his employment that McArdle would:

> (a) oversee the day-to-day management of Capital and Worldwide and the services provided by Capital to Fund A and Fund B;
>
> (b) manage the overall resources and operations of Worldwide, Capital, Fund A and Fund B;
>
> (c) act as a main point of contact between the board of directors of Worldwide, Capital, Fund A, Fund B, other employees and the public;
>
> (d) ensure that Capital, Fund A and Fund B were operating using the Model;
>
> (e) utilize good business judgement to make corporate decisions with respect to Worldwide, Capital, Fund A, Fund B and their operations for the benefit of all stakeholders;
>
> (f) devote his entire business, effort, time, energy and skill to fulfil the duties of his position and those assigned to him;
>
> (g) use best efforts to promote the success of the business of the Petitioner;
>
> (h) cooperate fully in the advancement of the best interests of the Petitioner;
>
> (i) hold in strict confidence any information concerning the business of the Petitioner;
>
> (j) refrain from:

> (1) engaging in any activity or providing services to any other business or person that would interfere with his employment obligations;
> (ii) engaging in employment with a competitor;
> (iii) misappropriating or attempting to misappropriate any business opportunity, funds or property of the Petitioner;
> (iv) committing fraud or acting dishonestly against the Petitioner;
> (v) disparaging the Petitioner;
> (vi) disclosing confidential information to any person except with the prior written consent of the Petitioner; and
> (vii) taking advantage of, deriving a benefit or otherwise profiting from any business opportunities that he became aware of in the course of his employment with Worldwide, even if the Petitioner did not take advantage of or exploit such opportunities

(*Id.* ¶¶ 15-17.) As both Capital's and Worldwide's highest ranking officer, McArdle held a position of utmost trust with, and owed fiduciary obligations to, both Capital and Worldwide. (*Id.* ¶ 18.) The services performed by him were of a special, unique and unusual character. McArdle was expected to act as a leader and uphold the fundamental values of each of the petitioners. (*Id.*) Given his role, McArdle was involved in identifying business opportunities for the petitioners and establishing and maintaining relationships with businesses and others for the benefit of Petitioner. (*Id.*)

**D. McArdle's Misconduct and Reedy's Knowledge**

Throughout his employment, McArdle failed to discharge his duties as Chief Executive Officer, fiduciary, and director. In the Canadian Litigation, Petitioner alleges that McArdle mismanaged the operations of Capital, Worldwide, Fund A, and Fund B, acting to advance his own financial and reputational interests to the detriment of the Petitioner and in breach of McArdle's fiduciary obligations. (*Id.* ¶ 19.)

McArdle is alleged to have diverted consulting and referral fees from third parties for his own personal benefit, contrary to the terms of his employment. (*Id.* ¶ 20.)

Respondent was aware of these arrangements and engaged in discussions with McArdle about referral structures on several occasions. (*Id.*)

Petitioner has also pleaded that McArdle misappropriated company assets by incurring expenses unrelated to Petitioner's business. (*Id.* ¶ 21.) Respondent was generally aware of these expenditures and, in several cases, personally benefited from them. (*Id.*) One such example is the "Boardroom" SaaS academy program, in which Respondent participated despite the lack of SureSwift's board authorization. (*Id.*)

It is further alleged that McArdle misdirected funds and misallocated expenses in a manner designed to maximize his personal profit. (*Id.* ¶ 22.) This included miscalculating management fees charged to Fund A and Fund B to inflate the value of Capital and Worldwide, without disclosing these changes to investors. (*Id.*) Respondent, as part of the leadership team, was involved in discussions regarding these improper recalculations. (*Id.*) For example, in May 2022, the Vice President of Finance specifically informed Respondent that Worldwide's economics had "improved" due to shifting additional expenses to individual business units owned by the Funds. (*Id.*)

Additionally, Petitioner has pleaded that McArdle awarded himself compensation without authorization and failed to properly account for his salary. (*Id.* ¶ 23.) Records show that McArdle blind-copied Respondent on emails to business partners revealing confidential negotiations and board-level discussions about his compensation. (*Id.*)

It is also pleaded that McArdle attempted to restructure Capital and Worldwide for his personal benefit and contrary to SureSwift's interests. (*Id.* ¶ 24.) As part of this effort, McArdle promised equity interests in Worldwide to members of the leadership team,

including Respondent, who actively contributed to the development of these restructuring plans. (*Id.*)

Petitioner has further pleaded that McArdle used Capital's funds to purchase an online media company, Tech.mn, well outside Petitioner's SaaS-focused mandate, and later agreed to sell it on terms disadvantageous to Capital, namely for US$100 while obligating Capital to pay US$75,000 in donations to the acquirer. (*Id.* ¶ 25.) Pursuant to the sale agreement, McArdle also became a board member of the acquirer. (*Id.*) Respondent oversaw Tech.mn's performance and helped draft the sale agreement, which contained provisions highly unfavorable to SureSwift. (*Id.*) In an email from Respondent to McArdle, he acknowledged the conflict of interest in the transaction for McArdle, stating: "Since you'll kinda be personally on both sides of [the Tech.mn sale agreement], thought I'd share it out in case you have any questions on what's here or how the sausage got made." (*Id.* ¶ 25, Ex. A.)

Finally, SureSwift has pleaded that McArdle's misconduct involved a company called Groove Capital ("Groove"), a competing venture in which SureSwift held no stake, all while serving as SureSwift's CEO. (*Id.* ¶ 26.) McArdle shared proprietary information with Groove and used SureSwift resources for Groove's benefit. (*Id.*) McArdle even sought Respondent's input concerning Groove's formation and asked that the details be kept confidential. (*Id.*) Respondent provided the requested advice. (*Id.* ¶ 26, Ex. B.)

### E. McArdle's Resignation and the Transition Agreement

On or around July 2022, McArdle and Petitioner (among others) entered into a transition agreement (the "Transition Agreement"), pursuant to which McArdle was to

resign from his employment positions with Capital and Worldwide. (*Id.* ¶ 27.) Petitioner entered into the Transition Agreement relying on misrepresentations made by McArdle. (*Id.*)

The Transition Agreement imposed clear post-departure obligations on McArdle. It required him, explicitly and by necessary implication, to refrain from soliciting Petitioner's employees for a period of twelve months, to avoid using or disclosing any trade secrets or confidential information of Petitioner, and to obtain prior approval for the form and content of any communication to Petitioner's personnel concerning his resignation. (*Id.* ¶ 28.)

Despite these terms, Petitioner has pleaded in the Canadian Litigation that McArdle immediately violated the Transition Agreement by soliciting SureSwift employees, including Respondent himself. (*Id.* ¶ 29.) Within weeks of entering into the Transition Agreement, Respondent resigned and later joined McArdle in establishing Big Band, a company in the business of acquiring and growing SaaS companies. (*Id.*)

The evidence further shows that McArdle systematically diverted confidential, proprietary, and trade-secret information to his personal email accounts, HubSpot accounts, and future business associates, including Respondent. (*Id.* ¶ 30.) In particular, McArdle and Respondent routinely blind-copied highly sensitive materials to an unidentified HubSpot account since 2020. (*Id.* ¶ 30, Ex. C.)

Finally, McArdle disregarded the Transition Agreement's requirement that any communication to SureSwift employees about his resignation receive advance approval. (*Id.* ¶ 31.) He circulated multiple unauthorized communications about his resignation to

the leadership team, including an August 10, 2022 email titled "Confidential – Do Not Forward," which he sent to Respondent and others without obtaining permission. (*Id.*)

**F. Canadian Litigation**

Petitioner has suffered considerable harm as a result of McArdle's actions. In December 2022, Petitioner commenced the Canadian Litigation. (Luchenko Decl. ¶ 5.) McArdle has denied Petitioner's allegations and alleged his own counterclaim for alleged breach of the Transition Agreement. (*Id.* ¶ 6.) The Canadian Litigation is at the discovery stage, and the parties have exchanged their records and conducted their oral examinations for discovery. (*Id.* ¶ 7.)

Petitioner initiated this 1782 Application to further support its contention that McArdle failed to fulfill his duties as CEO, a fiduciary and a director and to defend McArdle's counterclaim. (*Id.* ¶ 8.) It is difficult to predict the exact duration of the Canadian Litigation, and while counsel for the Petitioner and McArdle have not discussed the number of days required for trial, it is expected to be lengthy and will likely be scheduled for dates after 2026. (*Id.* ¶ 9.)

**G. Respondent Possesses Highly Material Information Concerning McArdle**

Respondent has possession, custody, and control of information responsive to the Subpoenas because he had direct visibility into McArdle's Misconduct. (Wharton Decl. ¶¶ 20-31.) Emails produced in the Canadian Litigation demonstrate that Respondent was not only aware of McArdle's Misconduct but also assisted in advancing initiatives that were contrary to Petitioner's interests. (*Id.*)

Specifically, Respondent engaged in conversations with McArdle about consulting and referral fee arrangements through which McArdle personally profited. (*Id.* ¶ 20.) Respondent also participated in costly leadership-training programs that McArdle enrolled the executive team in despite having no board authorization to do so. (*Id.* ¶ 21.) Respondent took part in discussions surrounding the improper recalculation of management fees charged to Fund A and Fund B that were designed to inflate the reported value of Capital and Worldwide while withholding this information from investors. (*Id.* ¶ 22.) Respondent was likewise blind-copied on undisclosed communications in which McArdle shared confidential negotiations and board-level matters with his business partners. (*Id.* ¶ 23.) Beyond that, Respondent played a role in formulating restructuring proposals that were contrary to the Petitioner's interests and drafted transactional documents that similarly advanced McArdle's personal agenda at the expense of the Petitioner. (*Id.* ¶ 24.) Respondent also prepared a transaction agreement for the sale of Tech.mn, for which he clearly flagged McArdle's conflict of interest in it, and provided advice to McArdle respecting the formation of Groove, a competitor in which SureSwift had no interest. (*Id.* ¶¶ 25-26.)

The information requested in this 1782 Application from Respondent is directly relevant to Petitioner's legal and factual allegations in the Canadian Litigation. (Luchenko Decl. ¶ 10.) The Petitioner seeks documentary and testimonial information relating to 1) referral fees received by McArdle from third parties; 2) McArdle's compensation, benefits, and expenses at SureSwift; 3) McArdle's miscalculation of management fees; 4) McArdle's restructuring efforts; 5) acquisition, performance, and sale of Tech.mn; 6)

information related to Groove; and 7) McArdle's breaches of the Transition Agreement and circumstances of leaving Capital to incorporate Big Band. (*Id.* ¶ 11.) All of these issues are critical to Petitioner's allegations and defenses in the Canadian Litigation. (*Id.* ¶ 12.)

## ARGUMENT

### A. Legal Framework of Section 1782

Section 1782 of Title 28 of the United States Code permits district courts to grant discovery for use in a foreign proceeding. The statute states, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person . . . .

District courts are permitted to, and routinely do, grant Section 1782 applications on an *ex parte* basis. Indeed, applications under Section 1782 are "customarily received and appropriate action taken with respect thereto ex parte," *In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976), because "witnesses can . . . raise[] objections and exercise[] their due process rights by motions to quash the subpoenas." *Id.*; *see also In re Application of Canadian Private Copying Collective*, No. 11-MC-0028 (SRN/SER), 2011 WL 1641982, at *3 (D. Minn. April 14, 2011) (granting *ex parte* application where respondent could "object or move to quash the subpoena after it has been issued"); *In re Letter of Request from Supreme Court of Hong Kong,* 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991) ("Indeed, such *ex parte* applications are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it.").



4568710.v2

A district court has authority to grant a § 1782 application where: "(1) the discovery is sought from a person found in th[e] district, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the applicant is an 'interested person' before such foreign tribunal." *In re Hallmark Capital Corp.*, 534 F.Supp. 2d 951, 953-54 (D. Minn. June 1, 2007) (granting *ex parte* motion for discovery for use in foreign proceeding); *see also Gov't of Ghana v. Proenergy Servs., LLC*, 677 F.3d 340, 343 (8th Cir. 2012) (Section 1782 "provides for a threshold determination of whether to allow foreign litigants to enjoy discovery in U.S. courts in accordance with federal rules").

Once the three statutory requirements are satisfied, the court may grant discovery under Section 1782 in its discretion. *In re Hallmark Capital Corp.*, 534 F. Supp. 2d at 954; *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015). The Supreme Court has identified four factors that "bear consideration" in ruling on a Section 1782 application: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case the need for discovery generally is not as apparent; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, or the court or agency abroad to U.S. federal-court judicial assistance;" (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65 (the "*Intel* factors")). A court has discretion to grant an application under § 1782 if doing so would (1) provide an efficient means of assistance to participants in international litigation, and (2) encourage foreign countries to provide reciprocal means of assistance to

United States courts and litigants. *In re Hallmark Capital Corp.*, 534 F. Supp. 2d at 954 (citing *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1097, 1101 (2d Cir. 1995)).

**B. This Application Satisfies the Requirements of Section 1782**

1. Respondent is "Found" in this District

Courts broadly interpret the first statutory element, which requires only that the person from whom discovery is sought is "found" or "resides" within the district. *In re Edeleman*, 295 F.3d 171, 178-80 (2d Cir. 2002). Here, based on SureSwift's records, Respondent lives in Falcon Heights, Minnesota. (Wharton Decl. ¶ 13).

2. The Discovery Sought is "For Use" in "Foreign Tribunals"

Petitioner satisfies the second statutory requirement—that the requested discovery be "for use" in "foreign tribunals—because they will use the requested discovery to pursue their claims and defenses in the Canadian Litigation. *See supra* at Section G.

"[D]iscovery sought pursuant to § 1782 need not be necessary for the party to prevail in the foreign proceeding in order to satisfy the statute's 'for use' requirement." *Mees*, 793 F.3d at 298. To be "for use," the petitioner need only show that the materials "will be employed with some advantage or serve some use in the proceeding—not necessarily something without which the applicant could not prevail." *Id.*[2] Here, Petitioner's Canadian counsel in charge of the Canadian Litigation has provided a sworn declaration confirming

[2] Further, Petitioner is not required to show that the requested discovery sought would be discoverable or admissible in the Canadian Litigation. *Intel*, 542 U.S. at 260 ("[N]othing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there.")

that the requested discovery is relevant to the foreign proceedings and how the requested discovery will be used in those proceedings. (Luchenko Decl. ¶ 10.)

The Canadian Litigation is a proceeding in a "foreign tribunal" under Section 1782. Indeed, numerous courts have found that proceedings before Canadian courts qualify as foreign tribunals under Section 1782. *See, e.g.*, *In re Application of Canadian Private Copying Collective*, 2011 WL 1641982, *2 (D. Minn. Apr. 14, 2011) ("The discovery is for use in a proceeding in the Federal Court of Canada, which is a foreign tribunal within the meaning of ¶ 1782.")

Accordingly, the requested discovery is for use in proceedings before a foreign tribunal recognized under Section 1782.

3. Petitioner is an "Interested Person"

Petitioner is an "interested person" authorized to bring this application within the meaning of Section 1782. The Supreme Court held unequivocally that litigants in a foreign proceeding qualify as interested persons for purposes of Section 1782. *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke, § 1782." (alteration in original)). Petitioner is the plaintiff in the Canadian Litigation and thus an "interested person" under Section 1782. Accordingly, each of the requisite statutory elements necessary to permit this Court to order discovery under Section 1782 is satisfied.

### C. All Of The Discretionary Factors Weigh In Favor Of Granting The Application

Once the threshold requirements under Section 1782 are met, the Court should consider the four discretionary "*Intel* factors." Each of these factors weighs in favor of granting the requested discovery here.

*First*, the Respondent is not and will not be a party to the Canadian Litigation. *Second*, there is no reason to believe that Canadian court would not be receptive to evidence obtained through Section 1782 discovery. *Third*, Petitioner is acting in good faith and is not seeking to avoid any foreign restriction on gathering evidence. *Fourth*, Petitioner's narrow requests are carefully circumscribed and targeted to key facts so as to avoid placing any undue burden on the Respondent.

1. The Respondent is a not a Party in the Foreign Proceedings

Section 1782 discovery is particularly warranted when the party from whom discovery is sought is not a party to the foreign proceeding. *See Intel*, 542 U.S. at 264 ("[N]onparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unattainable absent § 1782(a) aid."). Here, the Respondent is not a party to the Canadian Litigation and, therefore, is beyond the jurisdiction of the foreign tribunal. *In re Armcon Ltd.*, No. 18-MC-51 (JRT/TNL), 2018 WL 3455485, at *2 (D. Minn. July 18, 2018) (weighing the first *Intel* factor in favor of discovery because the respondent "is not a participant to the foreign proceedings."); *In re CA Inv. (Brazil)* S.A., No. 19-MC-22 (MJD/SER), 2019 WL 1531268, at *4 (D. Minn. Apr. 9, 2019) ("[Respondent bank] is not

a participant to the foreign proceedings and is outside their jurisdictional reach. [Respondent] is an entity that likely has information related to the [events at issue in the foreign proceedings].”); *Consellior SAS*, 2013 WL 5517925, at *2 (holding that the 1782 “[r]espondents are not parties to the action in France and therefore, the French Court cannot order them to produce discovery”). Accordingly, the first *Intel* factor weighs in favor of granting the Application.

2. Canadian Courts are Receptive to Discovery Pursuant to Section 1782

Under the second *Intel* factor, a court looks to whether the foreign tribunal would be receptive to evidence obtained pursuant to Section 1782. *See Intel*, 512 U.S. at 264. The burden is on the party opposing Section 1782 discovery to prove that the foreign tribunals will not be receptive to evidence obtained in the United States. *In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Ord. Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 13 MISC. 397 PGG, 2014 WL 7232262, at *7 (S.D.N.Y. Dec. 10, 2014) (“[T]he weight of authority indicates that the party opposing the Section 1782 application bears the burden of proving the non-receptivity of the foreign tribunal.”); *In re Chevron Corp.*, 633 F.3d 153, 163 (3d Cir. 2011) (the parties opposing discovery under section 1782 “bear the burden of proof on the receptiveness issue”). Indeed, “[a]bsent specific directions to the contrary from a foreign forum, the statute’s underlying policy should generally prompt district courts to provide some form of discovery assistance.” *Euromepa*, 51 F.3d at 1102. A court should only deny discovery on the basis of lack of receptiveness where it is provided with “*authoritative proof* that [the]

foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).

Here, there is no such "authoritative proof" demonstrating that the tribunal overseeing the Canadian Litigation would not be receptive to the requested discovery. *See Armcon Ltd.*, 2018 WL 3455485, at *2 (weighing the second *Intel* factor in favor of discovery where "[t]here is no indication that the [foreign court] would reject evidence obtained by the [petitioner] in the United States"). To the contrary, Petitioner's Canadian counsel has submitted a sworn declaration explaining that the Courts in British Columbia will be receptive to the evidence sought here. (Luchenko Decl. ¶ 13, Ex. B.) According to the cases cited in her declaration, there is no impediment to a party availing itself of the discovery procedures available under Section 1782. Noting that Section 1782 does not require a letter rogatory, the Courts in British Columbia have also held that no leave is required from them prior to a party availing itself of Section 1782 procedure: *Araya v. Nevsun Resources Ltd.*, 2019 BCSC 260 at ¶¶ 41, 45, and 46 citing *Penty v. Law Society of British Columbia*, 1999 BCCA 630 at ¶¶ 26, 27, 32, and 41; *see also In re: Baycol Products Litigation*, 2003 WL 22331293, *5 (D. Minn. May 6, 2003) (internal citations and quotations omitted) ("A Canadian court generally will be reluctant to prevent someone from gathering evidence extraterritorially, as its ultimate admissibility in a Canadian proceeding will be determined by the Canadian courts.")

3. The Application Does Not Seek to Circumvent Foreign Proof- Gathering Prohibition

The third Intel factor looks to "whether the § 1782(a) request conceals an attempt

to circumvent foreign proof-gathering prohibitions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. This factor focuses on whether the discovery is being sought in bad faith. *See Andover Healthcare*, 817 F.3d 621, 624 (8th Cir. 2016) (affirming district court's denial of motion under § 1782, in part, due to applicant's "apparent attempt to avoid or preempt an unfavorable decision on discovery by [a] German court"). There is no requirement that a petitioner must seek discovery of the material in the foreign tribunal before filing a Section 1782 application. *Mees*, 793 F.3d at 303 ("We have rejected such a 'quasi-exhaustion' requirement, reasoning that it 'finds no support in the plain language of the statute and runs counter to its express purposes.'"). Likewise, the fact that material sought may not be discoverable in the foreign jurisdiction does not mean that an attempt to obtain such material via Section 1782 is an effort to circumvent proof-gathering restrictions. *Id.* ("[Section] 1782 contains no foreign-discoverability requirement.").

Here, Petitioner is seeking discovery in good faith for use in the Canadian Litigation and there is no indication that this Application seeks to circumvent any foreign proof-gathering procedures. *Armcon Ltd.*, 2018 WL 3455485, at *2 (weighing the third *Intel* factor in favor of discovery where there was no "indication that [petitioner] [was] attempting to circumvent foreign proof-gathering procedures"). To the contrary, and as the declaration of Petitioner's Canadian counsel highlights, the information sought is directly relevant to the Canadian Litigation. (Luchenko Decl. ¶ 10.) Accordingly, the third *Intel* factor weighs in favor of granting the Application.

4. The Discovery Sought by Petitioner is Neither Unduly Intrusive Nor Burdensome

The fourth *Intel* factor looks to whether the discovery requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. "[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. Furthermore, "to the extent a district court finds that a discovery request is overbroad, before denying the application it should ordinarily consider whether that defect could be cured through a limited grant of discovery." *Id.*

Here, the document requests in the Subpoena are narrowly tailored to information relating to McArdle's work at Worldwide and Capital. Specifically, the discovery sought from the Respondent concerning McArdle's work is highly relevant to Petitioner's claims and defenses in the Canadian Litigation. *See Armcon Ltd.*, 2018 WL 3455485, at *2 (weighing the fourth *Intel* factor in favor of discovery because "the discovery sought is narrowly tailored" to the issues in the foreign proceedings). Moreover, in the event that Respondent believes it has grounds to object to producing the documents requested in the proposed subpoena, Respondent is entitled to raise those objections in a motion to quash or a motion for a protective order, which fully protects its rights. *See Canadian Private Copying Collective*, 2011 WL 1641982, at *3 (noting the respondent had the opportunity to "object or move to quash the subpoena after it has been issued").[3]

[3] To the extent Respondent has any concerns relating to confidential information, Petitioner is willing to accommodate such concerns by stipulating to an adequate protective order. *(cont'd)*

In this case, the Application fits squarely within the goals of Section 1782: to provide equitable and efficient means to assist parties engaged in litigation abroad. The statutory requirements of Section 1782 are satisfied and the discretionary factors overwhelmingly weigh in favor of granting this Application.

**CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the Application; (b) enter the Proposed Order filed with the Application; and (c) grant any and all other relief to Petitioner as this Court deems just and proper.

Dated: August 6, 2026.

**FELHABER LARSON**

By: /s/ *Richard R. Voelbel*

Ryan A. Olson, #0340935
Richard R. Voelbel, #0387091
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402-4504
Telephone: (612) 373-8544
Facsimile: (612) 338-0535
rolson@felhaber.com
rvoelbel@felhaber.com

**ATTORNEYS FOR SURESWIFT CAPITAL INC., SURESWIFT CAPITAL FUND A INC., SURESWIFT WORLDWIDE INC. AND SURESWIFT CAPITAL FUND B LLC**

---

(Luchenko Decl. ¶ 14); *see Minatec Fin. S.A.R.L. v. SI Group Inc.*, 1:08- CV-269 (LEK/RFT), 2008 WL 3884374, at *1 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of § 1782 is that it permits this Court to impose a protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed.").