IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE APPLICATION OF SURESWIFT CAPITAL INC., SURESWIFT CAPITAL FUND A INC., SURESWIFT WORLDWIDE INC. AND SURESWIFT CAPITAL FUND B LLC FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. ___________ |

-

**DECLARATION OF DON WHARTON**

-

I, Don Wharton, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1. I submit this declaration in support of the Ex Parte Application and Petition for an Order to Conduct Discovery from Chris Reedy ("Respondent") for Use in a Foreign Proceeding pursuant to 28 U.S.C. § 1782 ("1782 Application"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the 1782 Application and accompanying Memorandum of Law.

2. Unless otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and information supplied to me by professionals retained by me.

3. I am the Founder, Director, and Executive Chair of SureSwift Capital Inc. ("Capital") and SureSwift Worldwide Inc. ("Worldwide").

4. I am also a shareholder of SureSwift Capital Fund A Inc. ("Fund A") and an investor in SureSwift Capital Fund B LLC ("Fund B", together with Fund A, Capital, and Worldwide, "SureSwift").

5. Capital and Fund A are British Columbia companies engaged in the business of locating, acquiring, operating, maintaining, and selling revenue generating businesses, primarily profitable and growing software as a service ("SaaS") businesses.

6. Worldwide is a wholly owned subsidiary of Capital.

7. Capital provides management services to Fund A and Fund B and is the Managing Member of Fund B.

8. The premise of Capital's business model is to locate, acquire, maintain and sell revenue generating SaaS businesses (the "Acquired Businesses").

9. Any and all profits from the Acquired Businesses are to be used strictly to repay debt, make new acquisitions, or return profits to shareholders and investors (the "Model").

10. Following Capital's initial success, Fund A was created, and thereafter, again based on Fund A's success, Fund B was created.

11. The business of each petitioner is based on the Model.

12. Respondent was the Vice President of Acquisitions for Capital and a member of SureSwift's leadership team from October 1, 2019, to August 16, 2022. In that role, he assisted with the acquisition of SaaS businesses for Capital, Fund A, and Fund B and was privy to conversations between the members of the leadership team.

13. According to SureSwift's records, Respondent lives in Falcon Heights, Minnesota.

14. Kevin McArdle ("McArdle") served as the Chief Executive Officer for Capital from 2015 to 2022 and for Worldwide from 2016 to 2022.

15. As the Chief Executive Officer of Capital and Worldwide, it was an express or implied term of McArdle's employment that he would oversee the day-to-day management of Capital and Worldwide, including the services provided by Capital to Fund A and Fund B; manage the overall resources and operations of these entities; act as the primary point of contact between their boards of directors, employees, and the public; and ensure that SureSwift operated in accordance with the Model.

16. McArdle was expected to exercise sound business judgment in making corporate decisions for the benefit of all stakeholders, devote his full time, effort, and

skill to his role, use best efforts to promote the success of SureSwift, and cooperate fully in advancing SureSwift's interests.

17. McArdle was also required to maintain strict confidentiality regarding all business information and refrain from any conduct that conflicted with his obligations, including engaging with competitors, misappropriating business opportunities or property, committing fraud or dishonesty, disparaging his business partners, disclosing confidential information without consent, or profiting from opportunities learned through his employment.

18. As the highest-ranking officer of Capital and Worldwide, McArdle owed fiduciary duties to both entities and held a position of utmost trust. He was expected to act as a leader, uphold their core values, identify business opportunities, and establish and maintain relationships for their benefit.

19. Following McArdle's departure, SureSwift commenced an action against him before the Supreme Court of British Columbia for the failure to discharge his duties as Chief Executive Officer and director (the "Canadian Litigation"). In the Canadian Litigation, it is alleged that McArdle mismanaged the operations of SureSwift to advance his own financial and reputational interests, in breach of his fiduciary obligations.

20. It is alleged that McArdle retained consulting and referral fees from third parties for his personal benefit, contrary to the terms of his employment. Respondent was aware of and participated in these arrangements. For example, on multiple occasions, McArdle asked Respondent about referral structures with third parties to whom McArdle referred businesses that he had learnt about through his employment with SureSwift.

21. SureSwift has also pleaded that McArdle misappropriated SureSwift's assets without authorization, including by incurring expenses wholly unrelated to SureSwift's business. Respondent was generally aware of these expenses and, in certain instances, participated in programs that McArdle purchased without obtaining the required approvals. For example, Respondent participated in a SaaS academy program called "Boardroom," which McArdle enrolled the leadership team in without first obtaining board approval.

22. Further, SureSwift has pleaded that McArdle misdirected funds and misallocated expenses to maximize his personal profit. In particular, McArdle miscalculated management fees charged to Fund A and Fund B to inflate the value of Capital and Worldwide without notifying investors. Respondent, as a member of SureSwift's leadership team, participated in discussions about the miscalculation of management fees. For example, in May 2022, SureSwift's Vice President of Finance advised Respondent that Worldwide's economics improved as a result of allocating additional expenses to individual business units owned by the Funds.

23. SureSwift has pleaded that McArdle failed to properly account for his salary and awarded himself compensation without authorization. Records show that McArdle routinely blind-copied Respondent on emails to me and other business partners, disclosing confidential negotiations and board-level discussions, including regarding his compensation.

24. It is also pleaded that McArdle attempted to restructure Capital and Worldwide for his personal benefit in a manner contrary to SureSwift's best interests. As part of these efforts, he promised equity interests in Worldwide to members of the leadership team, including Respondent. Respondent actively participated in developing these restructuring plans and participated in a Slack channel established for that purpose.

25. Further, SureSwift has pleaded that McArdle used Capital funds to acquire an online media company outside the SaaS space named Tech.mn for US$135,000, invested an additional US$286,000, and later agreed to sell it for only US$100 while committing Capital to pay US$75,000 in donations to the acquirer as part of the transaction. As part of the sale transaction, McArdle was appointed as a board member of the acquirer. Respondent oversaw Tech.mn's performance and assisted in drafting its sale agreement, which contained terms that were significantly unfavorable to SureSwift. Attached as Exhibit A is a May 20, 2021 email from Respondent to McArdle stating, "Since you'll kinda be personally on both sides of [the Tech.mn sale agreement], thought I'd share [the draft agreement] out in case you have any questions on what's here or how the sausage got made."

26. SureSwift has also pleaded that a third party involved in McArdle's misconduct was Groove Capital ("Groove"). SureSwift now understands that McArdle became a partner in Groove, a competitor in which SureSwift had no interest, while being the Chief Executive Officer of SureSwift. McArdle shared SureSwift's proprietary information with Groove and used SureSwift's resources to the benefit of Groove. SureSwift's records show that on April 10, 2020, McArdle sought Respondent's input

regarding the formation of Groove and asked him to treat the information as confidential. Respondent provided the requested advice. Attached as Exhibit B is a copy of that correspondence.

27. In July 2022, McArdle and SureSwift, among others, entered into a transition agreement (the "Transition Agreement"), pursuant to which McArdle was to resign from his employment positions with Capital and Worldwide. SureSwift entered into the Transition Agreement relying on misrepresentations made by McArdle.

28. The Transition Agreement expressly or implicitly required McArdle to refrain from soliciting SureSwift employees for 12 months; refrain from using or disclosing any trade secrets or confidential information of SureSwift; and obtain approval regarding the form and content of any communication to SureSwift employees concerning his resignation.

29. SureSwift has pleaded in the Canadian Litigation that McArdle breached the Transition Agreement by soliciting SureSwift employees, including Respondent. Shortly after the execution of the Transition Agreement, on August 16, 2022, Respondent resigned and later joined McArdle in forming Big Band Software Holdco LLC, a business that, similar to SureSwift, buys and grows SaaS companies.

30. McArdle also forwarded documents, correspondence, and highly sensitive, confidential, and proprietary information of SureSwift to his personal email accounts, HubSpot accounts, and his future business partners, including Respondent. Attached as Exhibit C is an example of emails containing such information that the Respondent blind-copied an unknown HubSpot account on them. Both McArdle and Respondent routinely blind-copied this HubSpot account on their emails since 2020.

31. Lastly, McArdle sent several communications to SureSwift's leadership team about his resignation without first obtaining required approval. One example is an August 10, 2022 email to members of SureSwift's leadership team, including Respondent, titled "Confidential – Do Not Forward".

32. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on July 21, 2026
in Victoria, B.C.

Don Wharton

-

4568723.v1

Message

**From**: Kevin McArdle [kevin@sureswiftcapital.com]
on behalf of Kevin McArdle <kevin@sureswiftcapital.com> [kevin@sureswiftcapital.com]
**Sent**: 11/6/2022 8:04:49 PM
**To**: Kent Chawrun [kent@chawrun.com]
**Subject**: Fwd: Tech.MN APA Draft 2 - Invitation to edit

**Redacted - Privileged**

---------- Forwarded message ---------
From: **Chris Reedy (via Google Docs)** <drive-shares-dm-noreply@google.com>
Date: Thu, May 20, 2021 at 4:10 PM
Subject: Tech.MN APA Draft 2 - Invitation to edit
To: <kevin@sureswiftcapital.com>

chris@sureswiftcapital.com has invited you to **edit** the following document:

# Tech.MN APA Draft 2

Think this is ready to sign and Jared has ok'd it. Since you'll kinda be personally on both sides of this, thought I'd share it out in case you have any questions on what's here or how the sausage got made :) - Chris

Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because chris@sureswiftcapital.com shared a document with you from Google Docs.

Google™

Message

**From**: Kevin McArdle [kevin@sureswiftcapital.com]
on behalf of Kevin McArdle <kevin@sureswiftcapital.com> [kevin@sureswiftcapital.com]
**Sent**: 4/20/2020 4:21:42 PM
**To**: Chris Reedy [chris@sureswiftcapital.com]
**Subject**: Re: Your Perspective

Cool. Checking with Reed on his schedule, but I'll book us. Thanks!

**Kevin McArdle**
Co-Founder and CEO
**SureSwift Capital**

Dream Exits for Bootstrapped SaaS Founders
952-999-3388
@Kevin_McArdle

On Mon, Apr 20, 2020 at 4:32 PM Chris Reedy <chris@sureswiftcapital.com> wrote:

> Very good. Tomorrow afternoon would be best. Thursday am is looking a bit choppy but is open after 11.
>
> **Chris Reedy**
> Head of Acquisitions
> **SureSwift Capital**
>
> Dream Exits for Bootstrapped SaaS Founders
> 507-312-7930 (o)
> 612-414-1539 (m)
>
> On Mon, Apr 20, 2020 at 3:55 PM Kevin McArdle <kevin@sureswiftcapital.com> wrote:
>
>> Cool. How is tomorrow (Tues) afternoon or Thurs morning?
>>
>> **Kevin McArdle**
>> Co-Founder and CEO
>> **SureSwift Capital**
>>
>> Dream Exits for Bootstrapped SaaS Founders
>> 952-999-3388
>> @Kevin_McArdle

On Mon, Apr 20, 2020 at 3:52 PM Chris Reedy <chris@sureswiftcapital.com> wrote:

Sure!

**Chris Reedy**
Head of Acquisitions
**SureSwift Capital**

Dream Exits for Bootstrapped SaaS Founders
507-312-7930 (o)
612-414-1539 (m)

On Mon, Apr 20, 2020 at 3:46 PM Kevin McArdle <kevin@sureswiftcapital.com> wrote:

You open to a 45 min call with me and Reed to talk/think through this in a bit more detail?

**Kevin McArdle**
Co-Founder and CEO
**SureSwift Capital**

Dream Exits for Bootstrapped SaaS Founders
952-999-3388
@Kevin_McArdle

On Fri, Apr 10, 2020 at 12:22 PM Chris Reedy <chris@sureswiftcapital.com> wrote:

I like this concept very much, and am glad it's 'digital first'. Talked to Reed on related questions about a month ago. Might wanna invest :)

Thoughts -

- 'Pre-seed' is the right term but I sense there's an even early need being attacked: 'replacing friends and family funding'. I think a fund that (even more explicitly) replaces the traditional but elusive 'friends and family' that most of the world can't access could be a big draw for investors. People get that. And they know that if they look even at most good MN companies, the founders usually had a network with money or family money to get things off the ground (see Dispatch, for example).
- From an investment / portfolio perspective, the 'shots on goal' in the finance world usually implies that you're taking ONLY big swings / big ideas / high potential founders. Saying this because I sense from who Beta backed and the outline that there may be more of a range of businesses and broader set of terms to get to that many investments. So, smaller market/less aggressive might get indie VC type terms or debt, others more traditional angel money? Doesn't need to be detailed here - just wondering.
- Biggest difficulty in investing early / alone for a pre-seed only fund is the total inability to reduce later financing risk for portfolio companies. So, if possible, could be good to outline the seed funds in the network who also see this need and are open to leading later financings. Later funders will also ask

whether the fund is re-investing. It's ok if that a hard no always, but if it can't it's that much harder for portfolio companies to close later rounds.
- Related to above, may want to decide up front whether fund can / will reinvest either in good deals or pretty good deals that run out of money before they pique interest for later funders or get to CF +
- For some large angels, reinvestment rights are really important - but hard to defend in later financings - because they want to be able to double-down or more on risky bets when they aren't looking that risky anymore. A detail, but something you may get asked about from people who will want to invest to follow on terms you set, including reinvestment rights.

Hope this is helpful. Like the idea very much.

- Chris

**Chris Reedy**
Head of Acquisitions
**SureSwift Capital**

Dream Exits for Bootstrapped SaaS Founders
507-312-7930 (o)
612-414-1539 (m)

On Fri, Apr 10, 2020 at 10:18 AM Kevin McArdle <kevin@sureswiftcapital.com> wrote:

Would love your thoughts on this concept. Reed Robinson and I have been working through this together (side project for me). Please treat it as confidential at this point.

**Kevin McArdle**
Co-Founder and CEO
**SureSwift Capital**

Dream Exits for Bootstrapped SaaS Founders
952-999-3388
@Kevin_McArdle

Message

**From**: Kevin McArdle [kevin@sureswiftcapital.com]
on behalf of Kevin McArdle <kevin@sureswiftcapital.com> [kevin@sureswiftcapital.com]
**Sent**: 12/6/2021 9:35:52 AM
**To**: Moore, Taylor [tmoore@carlsonprivatecapital.com]; Cantwell, Andy [acantwell@carlsonprivatecapital.com]
**CC**: Chris Reedy [chris@sureswiftcapital.com]
**BCC**: 6812534@bcc.hubspot.com
**Subject**: Preview of New Opportunity
**Attachments**: Draft Note on Express Fund Opportunity.pdf

Taylor and Andy,

I wanted to give you an early heads up on this email that will be going out to all Fund B investors later this week (see attachment). This idea (minority investment in businesses not yet ready to sell outright) has been something we've wanted to test for a while. The opportunity to collaborate on it with a trusted partner (Calm Company Fund) makes this the right time and vehicle to do it. We expect upside in marketing and deal flow in the short term and do not expect this to be a drag on operations at all. I do not believe this will have any material impact on short or long-term valuation of SureSwift, but I did think it prudent to let you know it is in the works. Let me know if you have any questions or would like to discuss further.

Best regards,

**Kevin McArdle**
Founder & CEO
**Sureswift Capital**
Central Timezone (UTC -06:00)
@Kevin_McArdle
Dream Exits for Bootstrapped SaaS Founders
SURESWIFT CAPITAL

Message

**From:** Chris Reedy [chris@sureswiftcapital.com]
on behalf of Chris Reedy <chris@sureswiftcapital.com> [chris@sureswiftcapital.com]
**Sent:** 3/28/2022 4:24:19 PM
**To:** Kevin McArdle [kevin@sureswiftcapital.com]
**CC:** Jared Huff [jared@sureswiftcapital.com]; Tony Di Sarli [tony@sureswiftcapital.com]
**BCC:** 6812534@bcc.hubspot.com
**Subject:** Re: SureSwift - Comparison of Canada HoldCo to US HoldCo and Related Tax Issues

Late to the party here as I dig out from vacation and had our Acq quarterly today, but in my quick read of these docs my very honest first response was that the full tax implications for CN owners of the re-org might have changed their response - at least a bit - to the Carlson offer. Don't want to re-open that ball of wax, but it was honestly the first thing that came to mind.

In the category of general pushback on CN holdco, I'd add:

- Historical decisions on structure were done mostly to minimize ST tax for Canadian owners
- We are trying to reorg to focus on long-term value creation and believe there are many more sources of capital in the US
- Hiring pool will shrink if team comp is structured in a way that's unfriendly to US team members, and it's just not at all aligned with current team (under 10 CN team members, and none on LT or immediately below)

Thanks,
Chris

______________
**Chris Reedy** (he/him)
Vice President of Acquisitions
**SureSwift Capital**

Dream Exits for Bootstrapped SaaS Founders

On Mon, Mar 28, 2022 at 3:08 PM Kevin McArdle <kevin@sureswiftcapital.com> wrote:

> 100% agree. I'm just trying to anticipate objections so we can overcome them.
>
> **Kevin McArdle**
> Founder & CEO
> **Sureswift Capital**
>
> On Mon, Mar 28, 2022 at 3:04 PM Jared Huff <jared@sureswiftcapital.com> wrote:
>
>> I think we should be focused on setting the company up for long-term success rather than short-term profits? It seems that a lot of our current challenges and frustrations are because decisions have been made to benefit a few people in the short-term rather than focusing on the bigger picture.

Jared

**Jared Huff**

VP of Finance
SureSwift Capital

Dream Exits for Bootstrapped SaaS Founders

208-996-3402

jared@sureswiftcapital.com

SURESWIFT CAPITAL

**From:** Kevin McArdle <kevin@sureswiftcapital.com>
**Sent:** Monday, March 28, 2022 1:06 PM
**To:** Tony Di Sarli <tony@sureswiftcapital.com>
**Cc:** Chris Reedy <chris@sureswiftcapital.com>; Jared Huff <jared@sureswiftcapital.com>
**Subject:** Re: SureSwift - Comparison of Canada HoldCo to US HoldCo and Related Tax Issues

I'm re-reading all of this today in prep for a discussion tomorrow with the 'board'. While I agree that the long-term financial setup is better for the larger group of current and prospective investors/shareholders/team long-term...it will be hard to justify creating a taxable event for ourselves in the near term to the tune of $11M.

**Kevin McArdle**
Founder & CEO
**Sureswift Capital**

On Mon, Mar 28, 2022 at 10:21 AM Tony Di Sarli <tony@sureswiftcapital.com> wrote:

> Hi Kevin,
>
> I think there is a lot to unpack here and a call would probably be best. With that said, after reviewing all of the information, I still hold to the US HoldCo as the most viable option. I can explain more when we talk,

however, simplistically, a US HoldCo is more favorable for a greater majority of the company whereas a Canadian HoldCo is primarily favorable for the current ownership (excluding yourself). Specifically, when it comes to the tax implications and the required work associated with each. I think it also comes down to what investor(s) we have at the table and what makes most sense for their interests along with our interest in building a long-term, sustainable, profitably growing company that puts its people first. :-) (Apologies, I just had to put my plug in there one more time, lol).

Best Regards,

Tony

On Fri, Mar 25, 2022 at 10:38 AM Kevin McArdle <kevin@sureswiftcapital.com> wrote:

> Can you all scan this and give me your quick options? The "board" will be discussing on Tuesday.
>
> ---------- Forwarded message ---------
> From: **Ly, Sang Kiet** <sly@kpmg.ca>
> Date: Tue, Mar 22, 2022 at 7:11 PM
> Subject: SureSwift - Comparison of Canada HoldCo to US HoldCo and Related Tax Issues
> To: Kevin McArdle <kevin@sureswiftcapital.com>
> CC: Jared Huff <jared@sureswiftcapital.com>, Hannes Blum <hannesblum@gmail.com>, Peter Gustavson <pgustavson@gustavsoncapital.com>, McKay, Aidan <aidanmckay@kpmg.ca>, Kelly, Ryan J <rjkelly@kpmg.com>, Frank, Richele <rlfrank@kpmg.ca>, Gill, Ryan <ryangill@kpmg.ca>, Loccisano, Rebecca C <rsager@kpmg.com>
>
> Hi Kevin & Team,
>
> Please find attached our preliminary deck, comparing alternative go-forward structures for holding the assets of SureSwift Capital Inc. and SureSwift Capital Fund A Inc. through either a US holding company or a Canadian holding company.
>
> The following areas/issues have been analyzed, from both a US and Canadian perspective, for both alternatives:
>
> - Tax implications to the existing Canadian shareholders (inc. current implications on setting up the structure, and future implications);
> - Tax implications for Kevin (being the only existing US resident shareholder)

- Tax implications for the Company (i.e. US HoldCo or Canada HoldCo)
- Tax reporting complexity
- Transfer pricing issues
- Tax implications for new US investors at the holding company level
- Tax implications for the employees & board members with respect to new stock option plans

Additionally, we have provided an overview of (i) the steps required to implement either a US HoldCo structure or the Can HoldCo structure, and (ii) the US and Canadian income tax considerations of these steps.

As the transfer of the Target assets from SSC / Fund A to US HoldCo would be a taxable transaction from a Canadian perspective, we have also included an estimate of the upfront corporate tax payable by SSC and Fund A on the transfer of these assets to US HoldCo (see separate attachment).

Finally, we have included some other relevant considerations as you compare these two alternatives, including:

- Additional steps that may be layered onto the US HoldCo alternative,
- An option to simplify the Canada HoldCo alternative, by utilizing Fund A as Canada Holdco,
- A comparison of the effective tax-rates on active business income, going forward, if earned by Canada HoldCo, US HoldCo (as a subsidiary of a Canadian corporation), Canada HoldCo through a US branch, or directly by a US HoldCo.

Given the breadth of the information here, we understand that you may have a number of questions, and we'd be happy to join the call to discuss the deck – and any questions that you may have arising from it – at your next Tuesday's call with the Board of Directors.

Once we have an understanding of your preliminary thoughts / questions / concerns, we can also drill-down into further analysis on any particular issues that you feel are critical.

Best regards,

Sang

**Sang-Kiet Ly, CPA, CA, CFA***

Partner, KPMG Enterprise

*Practicing through a professional corporation

KPMG LLP

800-730 View Street

Victoria, BC V8W 3Y7

T: 250 480-3527

M: 250 889-0797

F: 250 480-3539

sly@kpmg.ca

------------------------------------------------------------------------

This email was sent to you by **KPMG** (http://info.kpmg.ca). To sign up to receive event invitations and other communications from us (we have some informative publications that may be of interest to you), or to stop receiving electronic messages sent by KPMG, visit the **KPMG Online Subscription Centre** (http://subscribe.kpmg.ca).

At KPMG we are passionate about earning your trust and building a long-term relationship through service excellence. This extends to our communications with you.

Our lawyers have recommended that we provide certain disclaimer language with our messages. Rather than including them here, we're drawing your attention to the following links where the full legal wording appears.

- **Disclaimer concerning confidential and privileged information/unintended recipient** (http://disclaimer.kpmg.ca).
- **Disclaimer concerning tax advice** (http://taxdisclaimer.kpmg.ca).

*If you are unable to access the links above, please cut and paste the URL that follows the link into your browser.*

------------------------------------------------------------------------

--

**Kevin McArdle**
Founder & CEO
**Sureswift Capital**
Central Timezone (UTC -06:00)
@Kevin_McArdle
Dream Exits for Bootstrapped SaaS Founders

--

**Tony Di Sarli**
COO/Integrator
**SureSwift Capital**

478-213-7720
tony@sureswiftcapital.com